Filed 6/19/13  P. v. Jackson CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RACARDO SHAVEZ JACKSON,<br><br>        Defendant and Appellant. | A132659<br><br>(Solano County Super. Ct. No. FCR245040) |

A jury found defendant guilty of second degree murder (Pen. Code, § 187, subd. (a)), and found true that he personally discharged a firearm that was the proximate cause of the death of the victim within the meaning of Penal Code section 12022.53, subdivision (d).  Defendant, through his appellate counsel, maintains that the trial court abused its discretion and violated his constitutional right to a fair trial when it excluded evidence related to the victim's violent character.  His counsel on appeal also challenges the lower court's ruling that qualified a detective as an expert and permitted him to testify about the expected location of shell casings if the gunman was in a particular position.

Subsequently, we granted defendant's request to file on his own behalf a supplemental brief.  Defendant argues that juror misconduct, prosecutorial misconduct, and the admission of certain statements he made to the police require

1

reversal. Alternatively, he asserts that this court pursuant to Penal Code section 1260 should modify the judgment to manslaughter (Pen. Code, § 192).

We are not persuaded by any of defendant's arguments. Consequently, we affirm the judgment.

## BACKGROUND

### The Charges

On December 12, 2007, an information was filed charging defendant with the murder of Troy Thompson in violation of Penal Code section 187, subdivision (a). It was further alleged that in committing the crime defendant personally discharged a firearm, which proximately caused great bodily injury and death within the meaning of Penal Code section 12022.53, subdivisions (c) and (d), and within the meaning of Penal Code sections 12022.5, subdivision (a)(1), and 12022.53, subdivision (b). Additionally, it was alleged that defendant had suffered a prior serious or violent felony conviction within the meaning of Penal Code section 667, subdivisions (b) through (i).

### The Start of the Trial

The defense filed a motion in limine that included, among other things, a request to exclude improper lay opinion on expert matters. In particular, defendant sought to exclude any testimony or other opinion evidence "by law enforcement officers regarding ballistics analysis as lacking in foundation, impermissible lay testimony on an expert subject; lacks foundation; irrelevant and unduly prejudicial . . . ." Defendant asserted that "[a]t least one police officer opined in his report that the arrangement of the casings was 'consistent' with the version of events described by prosecution witness [and] . . . [s]uch an opinion is clearly a lay opinion on an expert matter beyond common experience, which is inadmissible."

The trial court commented that the lay opinion evidence of the officer did not seem to be a proper subject for a lay opinion. The court explained: "So I'd

2

grant [the defense's motion] unless the People think they can adequately establish a foundation for an expert opinion by the police officer."

The prosecution answered that it was possible that the People could establish an adequate foundation and asked the court to reserve ruling on this issue. The prosecutor stated that she believed an officer could testify about whether he saw casings on the ground and whether the location of these casing was consistent with a witness's testimony. The court responded that it was not foreclosing that.

Defendant also moved under Evidence Code section 1103 to admit evidence of the violent character of Thompson, the victim. The trial court permitted admission of some of the evidence and excluded other evidence.

A jury trial began on August 9, 2010.

### The Prosecution

#### Testimony

On July 15, 2007, approximately 3:30 a.m., Officer Frank Piro responded to a call regarding a shooting. He spotted medics attending to Thompson. The medics placed Thompson in the ambulance and Piro traveled with him in the ambulance. Piro advised Thompson that he might die and asked him to identify who shot him. After a few seconds, Thompson responded, "Pete." When asked where Pete lived, Thompson responded, "Richmond." Piro continued to ask questions but Thompson was unable to answer. Detective James Carden testified Thompson was pronounced dead at 5:45 a.m.

Katy May Permenter testified regarding the events related to the killing of Thompson. She asserted that she had known Thompson for about one year before he was killed. They had been involved in a sexual relationship but had agreed to see other people.

Prior to the killing, Permenter had known defendant, who went by the name of "Pete," for about six months. She had a sexual relationship with defendant; defendant also had other girlfriends.

3

After losing her job in a shoe store, Permenter became a prostitute for, at most, two months. Defendant was her pimp. When Permenter told Thompson that defendant was her pimp, he became upset and jealous even though Thompson was also a pimp.

On July 14, 2007, Permenter moved from Vacaville to an apartment on the second floor in Fairfield. In the evening after the move, she asked defendant to come to her place; he came to the new apartment about 10:00 p.m.

Defendant and Permenter went to sleep around midnight when Thompson began calling on the phone and waking her. She did not answer the phone; Thompson then began to text her. He told her that he wanted to come to her place. She texted him and told him that she had company and did not want him to come to her place. Despite her telling him not to come, he told her that he was coming. Phone records indicated that Thompson left 14 or 15 text messages at Permenter's phone number between 12:39 a.m. and 3:30 a.m. on July 15, 2007. The record also established that he called Permenter 17 or 18 times between 1:15 and 3:30 a.m. on this same date.

Permenter testified that Thompson arrived at her door 20 minutes after he first told her he was coming. Thompson pounded on the door and yelled for her to come outside. Defendant awakened and calmly dressed. Permenter told defendant that it was Thompson and that he should let Thompson leave. Permenter's phone rang and she answered it. Thompson was on the line; she told him to leave because she had company. She told him that she was not his girlfriend. The knocking and phone calls stopped and Permenter believed that Thompson had left.

Permenter told defendant that she did not want to have any problems and asked him to leave. Defendant left the apartment for a few minutes.

Defendant saw Joseph Charles Pickett, who lived in the apartment directly below Permenter's apartment. He was in front of his apartment in the parking lot smoking a cigarette. Defendant asked him if he had seen someone knocking on

4

the door of the above apartment. Pickett told him that he had not seen anyone at the door but earlier he had seen someone in the dumpster area in the parking lot. Defendant returned to Permenter's apartment.

Defendant asked Permenter where Thompson lived and whether he was going to have to look for him to determine what Thompson's problem was. Defendant left again and drove away. According to Pickett, he noticed that defendant returned 30 or 45 minutes later. Permenter testified that defendant returned about 20 minutes later.

At some point, Thompson returned to Permenter's apartment building. He remained at the bottom of the stairs and began yelling her name, cursing, and acting irrationally. He acted as if he were high or drunk. Permenter noticed that Thompson had his hand in his pocket and she wondered whether he had a gun. She knew that Thompson kept a gun.

Permenter told defendant not to go outside and to let Thompson leave. Defendant, however, went outside. Permenter remained in the doorway of her apartment.

Defendant went down the stairs and met Thompson on the stairs. Thompson had his phone in one hand and he kept his other hand in his jacket pocket. Permenter testified that she saw Thompson remove his empty hand from his pocket and show it to defendant.[1] She stood in her open doorway and yelled that she was not either man's girlfriend and that they should leave as they were going to get her kicked out.

Permenter closed the door of her apartment. At that time, Thompson was at the bottom of the stairs. Seconds after closing the door, Permenter heard a series of gunshots.
Permenter opened the door and saw Thompson running up the stairs. He asked for help and said, "Let me in." His white T-shirt was completely covered in blood.

---

[1] Permenter did not mention this during her interview with the police on July 15, 2007.

5

She grabbed him but he collapsed outside the door and she could not hold onto him.

Permenter was in shock and could not recall the exact events after that but defendant came up the stairs and wanted his phone and keys, which she had thrown outside. Defendant went to the bottom of the stairs, and then went to the parking lot. Defendant looked back at Permenter and said, "Bitch, you'd better not say my name." Defendant did not tell Permenter that Thompson had pulled a gun or assaulted him. Defendant calmly walked to his car and drove away.

Permenter banged on doors of other apartments and asked people to help and to call 911. A person told her that an ambulance was on the way.

Pickett was watching a pornographic movie on the computer in his bedroom when he heard arguing outside. He looked out his window and saw and heard five or six muzzle flashes from a gun. He could not see the people's faces outside the window but noticed there were two people and, from their builds and clothing, he believed one was defendant and one was the person he had seen earlier at the dumpster.

Pickett testified that defendant took a step back after the first two shots, and Thompson began to fall. After a slight pause of a half second or less, defendant pointed the gun downward and shot three or four more times. Pickett did not know whether Thompson had his hand in his pocket or whether he had a weapon. He did not see anything in Thompson's hand and did not see defendant remove a weapon from Thompson. He also did not see a gun on the ground near Thompson. Picket called 911. About 30 seconds later, Permenter came running downstairs and banged on the doors, yelling for help. He went outside to help and found Thompson upstairs.

### Expert Testimony, Physical Evidence, and the Autopsy

The prosecution offered Detective William Shaffer as an expert "with respect to firearms." Defense counsel expressed reservations and reserved voir dire. The court permitted Shaffer to testify as an expert "subject to voir dire by

6

[defense counsel] on cross-examination." Defense counsel cross-examined Shaffer without conducting voir dire.

The evidence showed that there were seven .357 caliber shell casings, a copper jacket from an expended bullet, and a recovered bullet recovered from the apartment building where Permenter lived. Most of the casings were in the landscaping between the sidewalk and the parking lot. In Shaffer's opinion, all of the casings and the recovered bullet and copper jacket came from the same caliber weapon, a .357 SIG semi-automatic. The expended bullet appeared to be a hollow point; it had been fired and had passed through something.

A 1986 Toyota Supra registered to Thompson was parked in the apartment parking lot. The keys were in the ignition and the windows were partially down. The doors were unlocked.

On July 18, 2007, the police recovered from under the passenger seat in defendant's car a handgun and magazine with bullets in it wrapped in a plastic Target bag. There was no evidence at the scene consistent with this firearm.

Dr. Arnold Josselson, forensic pathologist, testified that the autopsy of Thompson revealed that he had five gunshot wounds, and two of them were fatal. He stated that Thompson suffered a gunshot wound on the left elbow and that it went in the back of his elbow. He also had a superficial gunshot wound on the right side of his back, a fatal gunshot wound in the right chest and abdomen, and two bullets in the upper abdomen. He also discussed a photograph, which showed the backside of the victim, and two gunshot wounds. He explained that one of the shots depicted in the photograph was the one he had described as going across the right side of Thompson's back and not entering his chest. There was no evidence of a fistfight. Drugs and alcohol were not in Thompson's body at the time of his death.

### Defendant's Statements to the Police

The police arrested defendant at gunpoint at his apartment in Sacramento on July 25, 2007. Defendant waived his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and spoke to Detective Joshua Cohen.

Defendant's statements to Cohen were taped and played to the jury. Cohen asked defendant, "You know why we're all here, right?" Defendant responded, "I'm pretty sure." Defendant stated, "[Y]'all what I done, you like—you twisted it up in the media, y'all got I mean you know what I mean?" Cohen responded that they did not have defendant's "side."

Cohen told defendant that they did not know exactly what had happened. They knew that some shots were fired and one person took off and one person was on the ground. Defendant answered: "I'm pretty sure she told you everything. I don't know if she lied or what, but if she told you what everything you know, I don't know why y'all put it out there like that, though." Cohen said that they "talked to a whole bunch of people."

Cohen told defendant that "obviously" he had "a part" in the incident and that was why it was important for the police to talk to him. Defendant answered, "I know." Defendant indicated that he would talk to Cohen but he did not "want to do it here" in Sacramento. Defendant said he would talk to Cohen when he was transferred to Fairfield.

Cohen told defendant that he was concerned that there was a gun somewhere; he did not want someone to get hurt. Defendant remarked that there was not any gun in Sacramento. Cohen asked about the location of the gun defendant used on July 15. Cohen noted that he would try to have defendant moved to Fairfield that night.

Cohen arranged to have defendant transported to Fairfield, and spoke to defendant again after the transfer. This interview was taped and again played for the jury. Another detective was also in the room and defendant asked to speak briefly to Cohen only. The other detective left the room and defendant inquired

8

whether he could talk to Cohen off the record.  Cohen emphasized that he was a police officer and that "there's really not much off record with me when it comes to something like this."  He elaborated that he would share the report with the district attorney and the information could not be secret.  Cohen added that it was his understanding that defendant wanted to have his side of what happened known. Cohen told defendant that his explanation would become part of the official record.  He also advised defendant that he would do further investigation if defendant gave him information that was "drastically" different from the information he already had.

Defendant stated that the news in the paper and on the Internet stated that he was wanted for "killing somebody and hanging out in the parking lot waiting for somebody to come out . . . ."  He complained that "they already got me guilty." He asked how he could get a "fair fight" since they "painted" him "like a monster."  Defendant remarked that he did not have an attorney and did not know how much to say.  He did not know what information would hurt him and what would help him.  He asked if he could have somebody there with him.  When Cohen asked whether he was asking for a lawyer, defendant answered, "Yeah." Cohen explained that he did not have lawyer to assign to him at that point and that would be done after he was booked and had his first court appearance.

Defendant stated that he wanted to ask Cohen simple questions off the record and advised Cohen that Cohen could give defendant an affirmative or negative response.  Defendant asked whether his arrest warrant was for murder; Cohen told him that it was.  Defendant asked whether it could be "just manslaughter."  Defendant added:  "If I say, 'woo' . . . and we go through all the things and you talk to whoever you need to talk to whoever I need to talk to and you take to who is the [district attorney] and maybe we can work something with that.  That's what I mean you know like, you feel me?  If you know what I'm saying, if my story get out, the whole truth you know what I'm saying and then

9

investigate with what you heard or what not and you pretty much the [district attorney] can just see and maybe it could be that." Cohen responded, "Okay."

### *The Defense*

#### *Defendant's Testimony*

Defendant was 36 years old at the time of trial. He was convicted of robbery when he was 18 years old and did not use a gun during the robbery. In 1994, at the age of 20, he was convicted of a felony involving the unlawful taking of a car.

Defendant stated that he met Permenter at a Motel 6 in Fairfield in the middle of the month of February 2007. Initially they were simply friends but after about two months they began a sexual relationship.

Permenter told defendant that she was a prostitute and that Thompson was her pimp. She showed defendant a listing on Craig's list. Defendant denied ever being Permenter's pimp and claimed that he never posted any ads for her. He saw other women while dating Permenter.

Permenter disclosed to defendant that Thompson did not treat her well and that she was afraid of him. She related an incident where Thompson put a gun to her head and told her he would kill her if she tried to leave him. She also stated that Thompson's friends robbed her at a motel and she believed Thompson "was behind it." Defendant also heard from an acquaintance that Thompson always carried a gun, was quick to pull it out, and was a bully "looking for stuff to get into." He also heard that Thompson had pistol whipped a person because he owed Thompson money. He also was told that Thompson had raped a woman.

Defendant did not personally know Thompson but knew people who had heard of him. He spoke with Thompson twice on the telephone and Thompson said, "I'm Pretty Boy." Defendant spoke to Thompson because Thompson would call Permenter 20 to 30 times in a row; he hoped Thompson would stop calling if he heard defendant's voice. Thompson repeatedly said that Permenter was "my bitch" and instructed defendant to stay away from Permenter.

10

About one month before the shooting, a cousin of defendant's friend reported that Thompson had stated that he would "fuck" defendant up for "messing with" Permenter. Defendant also saw e-mails sent to Permenter showing Thompson holding a firearm pointed at the camera. Defendant considered these photographs to be threats that Thompson would use a gun on him.

Defendant had a gun in July 2007 for protection. It was not his own gun but belonged to his friend. Defendant stated that he had been robbed in Oakland and a person had pulled a gun on him in Fairfield. He denied that he had a gun because he was selling drugs or pimping. Defendant admitted that his cursor on his "My Space" page had a pistol as the cursor and a click brought up a gun scope. He also acknowledged that the background on his My Space page consisted of marijuana leaves.

On July 14, 2007, Permenter called defendant and invited him to come to her new apartment. He went over to her place after 10:00 p.m. They fell asleep about 12:00 or 12:30 a.m.

Defendant testified that he awoke because of loud knocking at the door. He roused Permenter and asked her to see who was at the door. He heard her speaking from inside the apartment to Thompson, who was outside the door. He joined Permenter at the door and noticed that Permenter was speaking to Thompson on the phone. Thompson told Permenter to come outside. Permenter repeatedly told Thompson to leave. The exchange at the door lasted about three minutes and then it became quiet; Permenter hung up the phone. Permenter and defendant looked out the window; they did not see Thompson.

Defendant decided to go outside to look around to see if Thompson had left. He did not bring his gun with him and did not intend to confront Thompson. He saw Pickett and asked him if he saw anybody. He walked to the parking lot and then returned to the apartment. He denied that he left for a short time in his car.

11

When he returned to the apartment, Permenter played the voicemails from Thompson. Thompson told Permenter to pick up the phone. Other messages told her that he was right outside and that she should come outside or answer the phone. Other messages stated that he knew she had someone there. One message indicated that he was coming back. Permenter's phone continued to ring but she did not answer it.

Permenter informed defendant that Thompson had given her money so she could lease the apartment and was "just trying to start shit." Defendant retrieved his gun from the dresser and intended to return to Richmond. Permenter, according to defendant, asked him not to leave.

Defendant continued to look out the window when he saw the lights of a car go out and heard a car door slam shut. Defendant saw Thompson; Thompson was yelling toward the apartment. Defendant could not hear what Thompson was saying. Defendant noticed that Thompson had his hand in his pocket and it looked as if he might have something. Permenter said: "What is he doing? He got a gun."

Defendant opened the door, stood in the doorway, and asked Thompson what the problem was. Defendant wanted to calm Thompson down. Permenter instructed him not to worry about Thompson because he was just trying to cause problems. She grabbed defendant's arm and told him not to go outside.

Defendant went down the stairs and defendant could see the outline of a gun in Thompson's pocket. Thompson came toward him. They met close to the stairs, by the bushes, and were about 10 feet apart.

Defendant asked Thompson why he had his hand in his pocket and Thompson did not answer. Thomson asked him what he had to say about their "playing" him and kept say, "that bitch this, that bitch that." Defendant told Thompson that the police were going to come because of the noise. Defendant was wary of Thompson because he believed he had a gun, but he claimed that he was not upset with him. He believed that they could come to a calm solution.

12

Thompson pulled the gun out of his front jacket pocket when he was about four feet away from defendant. He told defendant that he "got my strap." He pointed the gun at defendant. Defendant started backing up until he bumped into the stairway railing. He asked Thompson why he had his gun out and Thompson said that he could kill him "and that bitch." Thompson put the gun in defendant's face, with his finger on the trigger and the hammer cocked.

Defendant was scared and thought he was going to die. Defendant turned sideways and backed away; he pulled his own gun from his back right pocket and started shooting. Thompson never fired his gun. Thompson fell back into the bush and defendant asserted that he did not fire any more shots. He claimed that he never intended to kill Thompson. He denied standing over Thompson and shooting at him.

Thompson started getting up from the bush and defendant saw the gun on the ground. Defendant picked up Thompson's gun while Thompson ran up the stairs to Permenter's door. Defendant was stunned and stood there for a minute. He went to his car but realized he did not have his key. He put both guns in his pockets and ran upstairs.

Defendant spotted Thompson sitting with his back to the wall next to the door of Permenter's apartment. Defendant pounded on the door and told Permenter to open it because he needed his keys. Permenter opened the door, shoved his keys at him, and slammed the door shut. He ran downstairs and left. He did not tell anyone that someone had tried to kill him. He said nothing more to Permenter and had no further contact with her.

Defendant drove to the home of his daughter's mother and got a plastic Target bag. He wiped off the handle of Thompson's gun where he had touched it and took out the magazine. He put the magazine and gun in the bag. Defendant buried Thompson's gun but later retrieved it and put the bag under the seat of the car. He buried the gun that he used. He asserted that he was not thinking rationally.

13

Defendant went to Sacramento the next day and stayed at an apartment belonging to his cousin's friend. He remained in the apartment until his arrest because he knew from the newspaper that he was wanted for murder.

Defendant sated that he received legal advice on the phone from a lawyer at a legal group in Southern California before his arrest. He did not remember the lawyer's name or the group's name. Without disclosing details, defendant told the attorney that he had shot Thompson in self-defense. The lawyer told him that self-defense was "legal" but that he would probably face a charge of murder and a jury trial. Defendant claimed that when he was talking to Cohen and said, "Maybe it could just be that," he was referring to self-defense, not manslaughter.

Defendant admitted that he did not tell Cohen that Thompson had threatened him. He also did not mention that his gun was buried.

Defendant testified that after he told Cohen he wanted an attorney, Cohen tried "to get in contact with an attorney that" he had before. Defendant reported that his attorney "actually called . . . one of the detectives back" and they gave him a cell phone and he talked to the attorney. Defendant reported that he did not tell Cohen his "story" because his attorney advised him not to answer any questions.

### *Physical Evidence*

Richelle Neverson, senior forensic scientist for Technical Associates was retained by the defense to do DNA testing on the gun and magazine recovered from the rental car. Neverson was unable to obtain sufficient DNA in one swab and had to combine swabs from different parts of the gun into one sample and all the swabs from the magazine into another sample.

Neverson was unable to exclude either defendant or Thompson as being potential donors to the profile from the gun. Thompson's DNA matched the combined sample at seven of the nine loci, and defendant's DNA matched it at five loci. There was a chance of 1 in 4,550 that an African-American other than Thompson contributed to the combined sample, which was a 99.97 percent exclusion rate. There was a chance of 1 in 589 that an African-American other

14

than defendant contributed to the combined sample for a 99.83 percent exclusion rate.

Jacobus Swanepoel, a criminalist with Forensic Analytical Sciences, was hired by the defense as a consultant. He stated that he was unable to determine the position of the shooter or the decedent and that the evidence showed only the general area where the firearm was discharged. The general area was in front of the stairs leading up to the apartment. The location of the casings was not inconsistent with the testimony of any of the witnesses. The casings were also not inconsistent with the autopsy. The physical evidence, however, was insufficient for him to determine whether the witnesses' statements were correct.

### Evidence of Thompson's Violent Character

Katrina Lanae Beckman, who was 24 years old at the time of the trial, testified that she lived with Thompson as his girlfriend off and on for about six months. They broke up five days before he was killed. She was a prostitute but was not working for him. Thompson had slapped her once but this was the only time he was violent with her. She did not believe Thompson was a violent person and never saw him with a gun.

Demetria Adams, a defense investigator interviewed Beckman before trial. Beckman had informed the investigator that she worked for Thompson as a prostitute. Beckman told the investigator that she had separated from Thompson because of the physical abuse. When confronted with a diary entry indicating that she was punished by someone for not following the rules, which resulted in her receiving two black eyes, Beckman told the investigator that Thompson was the person who did this to her. She also disclosed that she never saw Thompson with a gun and had not known him to carry one.

Permenter admitted that Thompson had pulled a gun on her in his home a few months before the shooting. Thompson told her that the gun was not loaded and he did not do it again.

15

The court also admitted documentary evidence that Thompson had a conviction for being an ex-felon in possession of a firearm.

*Rebuttal*

Detective Shaffer testified that there were four manufacturers of the type of weapon used to kill Thompson. He stated that if a person fired the gun with his back to the staircase railing, as defendant said he did, the casings would have been in the stairwell or near the foot of the staircase.

*Verdict, Sentence, and Appeal*

The case went to the jury at 9:00 a.m. on August 25, 2010. The next day, at 1:45 p.m., the jury returned its verdicts. The jury acquitted defendant of first degree murder and found him guilty of second degree murder. The jury also found that defendant personally discharged a firearm that was the proximate cause of Thompson's death. On August 27, 2010, the jury found the prior conviction allegation to be true.

On February 28, 2011, defendant moved for a new trial and filed a motion to reduce the verdict from murder to manslaughter. One of the grounds for a new trial was the alleged misconduct of Juror No. 8 and Juror No. 4. On June 10, 2011, the trial court denied the motion for a new trial and the request to reduce the verdict from murder to manslaughter. The court found the affidavits of the jurors inadmissible under Evidence Code section 1150. Furthermore, the court found that the affidavits did not establish misconduct.

After ruling on the motion for a new trial, the trial court sentenced defendant to a term of 30 years to life (15 years, doubled for the prior strike), plus a consecutive sentence of 25 years to life for the firearm enhancement. Thus, defendant's total sentence was 55 years to life. The court ordered restitution and imposed various fines and fees.

Defendant filed a timely notice of appeal. Counsel for defendant filed an opening brief and, subsequently, defendant requested permission to file a supplemental brief. We granted defendant's request and he filed a supplemental

brief.  The People responded to both briefs.  Additionally, defendant filed a petition for writ of habeas corpus that we are summarily denying in a separate order.

## DISCUSSION

### I. *Exclusion of Evidence*

#### A. *Background*

On July 30, 2010, defendant filed his motion under Evidence Code section 1103, subdivision (a) to have the trial court admit violent character evidence of Thompson.  This evidence, defendant argued, was relevant to show that he shot Thompson in self-defense.

Defendant argued:  "Troy Thompson was known to carry a gun.  He served a prison sentence for a violation of" Penal Code section 12021, subdivision (a)(1) "and for pimping.  He committed an armed robbery and assault with a firearm against Darryl Mercer while personally armed.  He has assaulted girlfriends who were also working for him as prostitutes—including Katrina Lanae Beckman and Terri Anderson.  Sylvia Fracisco, another former girlfriend, also had knowledge that Thompson owned a gun in the home, and will testify that he was violent towards her.  Katy Permenter told police that she believed Troy Thompson returned to her apartment with a gun on the night of the incident.  Physical evidence will be presented to corroborate that Thompson was in fact armed at the time of the incident.  Thus, evidence of Thompson's violent and hot-tempered character, in the form of opinions, reputation, and specific acts, is admissible when offered by the petitioner to prove that the conduct of Thompson created the need for self-defense.  (See, e.g., Evid. Code, § 1103, subd. (a)(1).)"

Subsequently, on August 6, 2010, defendant submitted four reports by investigator Adams.  The reports summarized interviews with Mercer and former girlfriends, Anderson, Beckman, and Fracisco.  One report communicated the exchange on the telephone between Adams and Mercer.  Adams asked Mercer, who was living in Arizona, about an incident involving Thompson in 2002.  The

17

report set forth the following: "Mercer said his memory of the incident is not as vivid anymore but that it was armed robbery and Thompson was the main offender. Mercer said he . . . encountered . . . Thompson, Thompson's mother, and some other people as he was walking past their home. Mercer said it was Thompson who had the firearm. Mercer said after the encounter, he saw some people up the street with a cell phone and yelled for them to call the police. Mercer said the suspects ran back inside of their house." Mercer added that he had known Thompson for quite some time and had never personally seen Thompson carrying a gun other than this one time when he was robbed. Mercer disclosed that he did not return to Fairfield to testify in the case against Thompson for robbery.

The report involving Anderson indicated that Adams contacted Anderson by telephone because she had discovered an arrest report from 2003 indicating that both Thompson and Anderson were arrested "in a prostitution sting in Sacramento." Anderson confirmed that she had been arrested and explained that she met Thompson while walking down the street in Fairfield. The report provided the following: "Anderson said she only prostituted for a couple of weeks in which she started turning tricks and giving Thompson all the money. Anderson said she prostituted two nights in Stockton before heading to Sacramento. Anderson said she was considered Thompson's girlfriend at the time in which he in turn paid for her expenses such as her hotel and food. Anderson admits that she is schizophrenic and was not taking her medications properly at the time."

When asked whether Thompson was ever violent towards her, Anderson said that he was. Adams's report stated as follows: "Anderson said Thompson didn't start hitting her until after the first few days. Anderson said if she rolled her eyes or if she didn't want to do something, Thompson would slap her. Anderson also advised that Thompson raped her twice. Anderson said that on one occasion Thompson wanted her to provide him oral sex and she didn't want to because she was tired from working. Thompson told Anderson that if she didn't give him oral

18

sex she was going to get punched in the face. Anderson said she complied with Thompson's demands out of fear." Additionally, Anderson noted that once she returned without any money and "Thompson beat her up really bad." Thompson, according to Anderson, "hit her repeatedly in her face with open hands." Thompson also hit her one time when she refused to put crack in her underwear. She reported that Thompson always carried "a [Derringer] with him and said it was because he was selling crack." Anderson said she relocated to San Jose after the arrest in 2003, and never heard from Thompson again.

On August 12, 2010, the trial court ruled that it was excluding "all evidence of prior bad acts of Thompson, subject to the receipt in evidence of evidence that would justify the giving of an instruction for self-defense regarding the shooting." The court continued: "So if at some point during the People's case, it's brought to my attention that sufficient evidence exists in the record, that would justify the giving of a self-defense instruction, then that's fine, but you can ask me to revisit the ruling then. . . . [T]hat doesn't mean that all of this is going to come in, because there are some [Evidence Code section] 352 issues, some of it is more probative than others on the violent nature of Thompson's conduct. Some of it is more remote."

After defendant's testimony, the trial court considered defendant's request to admit evidence and testimony under Evidence Code section 1103, subdivision (a). Counsel for defendant told the court that Mercer, although properly served in Arizona to attend the trial, had not arrived on the scheduled flight, and counsel was seeking to introduce Mercer's statement to police pursuant to Evidence Code section 1370 provided that she could obtain the police report. The police department had been unable to locate the report. The court ordered the prosecutor to make her best efforts to obtain the report.

The following day, August 19, 2010, the trial court announced that it would permit testimony about Thompson's violent character from Beckman, since she had "recent" knowledge about him. The court also granted the request to have the

19

photograph of Thompson showing him holding a firearm pointed at the camera admitted into evidence. The court also permitted the recall of Permenter to answer more questions on the facts and circumstances related to Thompson's pulling a gun on her. The court did not make any ruling on the evidence related to Mercer.

The trial court ruled that it would not allow evidence regarding the 2003 battery and rape of Anderson. The court explained that Anderson reported that she was schizophrenic and not taking her medication at the time of the incident. The court also found that evidence of the rape did not show the same violent propensity to shoot someone and there was no evidence that Thompson was seeking to sexually attack Permenter or anyone else on the night of his death. The court added: "And I think for all of those reasons, and there [are] a few others that I considered, in terms of the time that this might require to really delve into a whole other incident that's now seven years old, and which one of the principal percipient witnesses is not present . . . ." The court also noted that Anderson relocated in 2003 and had no further contact with Thompson.

On August 20, 2010, defense counsel informed the court that Officer Troy Oviatt had located the police report of the robbery of Mercer. The court found that all of the requirements of Evidence Code section 1370 had been satisfied.

A hearing was held outside the presence of the jury to determine whether the report should be admitted into evidence. Oviatt testified that he authored the 2002 report involving the robbery of Mercer. He, however, had no independent recollection of the events or the statements contained in the report.

The police report set forth the statement made by Mercer. Mercer stated that on November 18, 2002, he went to Thompson's apartment seeking $5 that Thompson owed him. Two women let him into the apartment and then would not let him leave unless he paid them $10. Thompson came down the stairs and asked Mercer why he was there. Mercer responded that he came to get the $5 Thompson owed him. Thompson answered: " 'I don't owe you money and you're not leaving. I have a gun on me. You all might not carry a gun but I always have a

gun on me.' " Thompson then took "a black semi-automatic handgun with a long barrel" out of his jacket and pointed it at Mercer. Thompson told Mercer: " 'Break yourself. You got money on you, break yourself.' " The two women took items from Mercer's pockets while Thompson pointed the gun at Mercer. The women removed keys, a $20 bill, a $10 bill, and between three to six $1 bills from Mercer's pockets. One of the women opened the door and, as Mercer turned to leave, one of the women punched him in the face. Thompson then hit Mercer on his left shoulder with either his fist or with the gun. Mercer was also kicked as he left. Mercer went to another apartment and told the people to call the police.

The police responded and detained the two women and Thompson. The police found money and keys, which Mercer identified as belonging to him, on Thompson. The police did not find a firearm, but they found twelve .22 caliber bullets in a container in the apartment. The suspects were arrested and charged with robbery and other crimes.

At the police station, Thompson refused to talk to the police but one of the woman indicated that she understood her rights and that she wanted to talk. She said that she had known Mercer for about four years and that she had asked him in the past not to come to her apartment. She asked him if he had the $30 he owed her and Mercer answered that he did not have any money. They then argued. She stated that Mercer "is crazy and everybody knows he is nuts and that he is a liar." She claimed that Mercer then left. She maintained that no gun was pointed at Mercer. She maintained that "she had no idea what [the police officer] was talking about" when told that Mercer's keys and money were found in Thompson's pocket. She insisted that "whatever happened was" Mercer's fault.

The second woman also wanted to talk and she denied ever being inside the apartment. She stated that she was walking by the apartment when she spotted Thompson hitting and kicking Mercer "in the butt." She said the two men were yelling and cussing at each other and that she did not see a gun. When asked

whether she knew Mercer, she responded: " '[E]verybody knows him, he sells crack and pulls knives on people.' "

The prosecutor informed the court that the charges against Thompson were dismissed at the preliminary hearing. Defense counsel said that a minute order showed that the dismissal occurred because Mercer failed to appear. The prosecutor argued that she had learned only the day before that the defense was intending to introduce this report and had been provided insufficient notice.

The trial court found that Mercer was an unavailable witness and that the statements attributable to him were made to a law enforcement official near the time of the alleged threat. The court also found that the incident was within five years of the filing of the instant prosecution and thus the issue was "whether the statement was made under circumstances that would indicate its trustworthiness." After hearing argument on this latter issue, the court refused to permit the report to be entered into evidence under Evidence Code section 1370 because it could not "legitimately conclude that this was made under circumstances that would indicate its trustworthiness."

The court pointed out that some circumstances tended to show the report's trustworthiness but no gun was located, another witness who had not been arrested did not indicate that a gun had been used, and both of the women claimed that Mercer was crazy or a liar. The court also emphasized that Mercer twice failed to appear in court. Furthermore, the main issue the defense wished to show was that Thompson had a gun but no gun was located.

Defense counsel then renewed the request to allow Anderson to testify. The court denied the request and stated that this evidence was cumulative and less probative. The court stated that the defense could have Fracisco testify because Beckman's testimony had been contrary to the defense's expectation. After the defense reported that it was unlikely to produce Fracisco, the trial court permitted the defense to submit documentary evidence that Thompson had been convicted for being an ex-felon in possession of a firearm.

22

On appeal, defendant argues that the trial court should have permitted the testimony of Anderson and the police report related to the robbery of Mercer. He asserts that excluding this evidence violated his statutory rights under Evidence Code section 1103, subdivision (a), and violated his Sixth and Fourteenth Amendment right to present a defense.

**B. *Standard of Review***

Only relevant evidence is admissible. (Evid. Code, §§ 350, 351.) Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." "The test of relevance is whether the evidence tends 'logically, naturally and by reasonable inference' to establish material facts such as identity, intent, or motive." (*People v. Garceau* (1993) 6 Cal.4th 140, 177, overruled on another issue in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.) "Evidence is irrelevant, however, if it leads only to speculative inferences." (*People v. Morrison* (2004) 34 Cal.4th 698, 711.)

Relevant evidence may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Courts have wide discretion in determining whether evidence is relevant, and if so, whether it should be excluded under Evidence Code section 352. (*People v. Mobley* (1999) 72 Cal.App.4th 761, 792-793, overruled on other grounds in *People v. Trujillo* (2006) 40 Cal.4th 165, 181, fn. 3.) A trial court's exclusion of evidence pursuant to Evidence Code section 352 is reviewed for an abuse of discretion. (*Olson v. American Bankers Ins. Co.* (1994) 30 Cal.App.4th 816, 826.)

Even if we conclude that the trial court abused its discretion in refusing to admit evidence, we will only reverse if the defendant can demonstrate prejudice. Defendant argues that the trial court's exclusion of evidence denied him his due

process right to present his theory of self-defense. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Courts, however, have consistently concluded that a trial court's erroneous exclusion of evidence that does not impinge upon a defendant's constitutional rights is reviewed under the standard of prejudice adopted in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)). (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 429.) The Constitution is not offended by "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326.) While a refusal to allow a defendant to present a defense infringes upon the defendant's constitutional rights and is subject to the stricter beyond a reasonable doubt standard set forth in *Chapman,* a rejection of only *some* evidence concerning the defense is reviewed under the *Watson* standard. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 (*Fudge*).) Under *Watson,* the reviewing court must affirm the judgment if it is "not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error . . . ." (*Watson,* at p. 837.)

Here, the alleged errors did not rise to the level of constitutional error because defendant was not denied the ability to present a defense. Exclusion of only some evidence concerning a defense is subject to the *Watson* standard of review and we will review the alleged error under that standard. (*Fudge, supra,* 7 Cal.4th at pp. 1102-1103.)

## C. *Excluding the Testimony of Anderson*

Defendant claims that the trial court abused its discretion when it denied his request to have Anderson testify that she worked as a prostitute for Thompson in 2003, and that Thompson hit her on various occasions, including when she refused to put crack in her underwear and when she returned without any money. She also was going to explain that she knew Thompson always carried a firearm because he

was selling crack.  This evidence, according to defendant, was highly probative and relevant to his claim that he shot Thompson in self-defense.

Evidence Code section 1101, subdivision (a), establishes the general rule that evidence of a person's character or a trait of his or her character is inadmissible when offered to prove the person acted in conformity with that character or trait on a specific occasion.  Evidence Code section 1103, subdivision (a)(1), provides an exception to that general rule applicable only in criminal cases.  It allows "evidence of the character or a trait of character . . . of the victim of the crime for which the defendant is being prosecuted . . . if the evidence is:  [¶] . . . [o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character."  Thus, Evidence Code section 1103, subdivision (a)(1), permits evidence of a victim's character when it is offered to explain, justify, or excuse the defendant's conduct toward the victim  (*People v. Tackett* (2006) 144 Cal.App.4th 445, 455), and may be "in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct" (Evid. Code, § 1103, subd. (a)).

A defendant charged with a violent crime, as in the present case, may offer evidence of a victim's character for violence to show the defendant acted in self-defense (*People v. Tackett, supra,* 144 Cal.App.4th at p. 454) when self-defense is raised.  (See, e.g., *People v. Wright* (1985) 39 Cal.3d 576, 587.)  Even when self-defense is raised, as it was in the present case, the trial court has broad discretion to determine whether it should be excluded under Evidence Code section 352.[2]  (See, e.g., *People v. Gutierrez* (2009) 45 Cal.4th 789, 827-828.)

In the present case, defendant has failed to show that the trial court's decision to exclude Anderson's testimony under Evidence Code section 352 was

---

[2] Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

" 'arbitrary, capricious or patently absurd' " and " 'resulted in a manifest miscarriage of justice.' " (*People v Gutierrez, supra,* 45 Cal.4th at p. 828.) Defendant argues that the trial court excluded the evidence because it found that the rape of Anderson was not probative of a character trait for physical violence. He maintains that the court could have excluded any testimony on the sexual assaults and permitted her to testify about Thompson's physical abuse.

The trial court, however, did not refuse to let Anderson testify simply because it found that the sexual assaults were not sufficiently similar to the incident involving defendant and Thompson. The trial court concluded that the evidence was not particularly probative because Anderson had no contact with Thompson since 2003 and thus she did not know if he was still carrying a gun. The evidence was cumulative because the jury heard evidence that Thompson was violent and that he sometimes had a gun.

Defendant complains that the jury heard little evidence regarding Thompson's propensity for violence. He acknowledges that he testified about what he knew about Thompson's propensity for violence, but the jury was instructed to consider his testimony "for the limited purpose of showing its effect on the defendant and not for whether it's true or false."

Defendant downplays the significant evidence in the record evincing Thompson's character. Beckman testified that Thompson slapped her once and the jury heard Adams's testimony that Beckman told her that she separated from Thompson because of the physical abuse. Permenter disclosed that Thompson had pulled a gun on her. Additionally, the court admitted documentary evidence that Thompson had a conviction for being an ex-felon in possession of a firearm and the jury saw the e-mail sent to Permenter containing a photograph of Thompson holding a firearm pointed at the camera.

Given the plentiful evidence that Thompson had a firearm and was violent, the trial court did not act improperly when it ruled that Anderson's testimony was inadmissible. Anderson's contact with Thompson was more than two years before

26

his death and she thus had no recent information about his character. Additionally, Anderson admitted that she is schizophrenic and had not been taking her medication at the time she knew Thompson. Thus the trial court properly weighed its concerns that Anderson's testimony would require a mini-trial on precisely what happened between Anderson and Thompson more than two years ago and whether her mental condition had clouded her memory or distorted her perception of events.

Even if we were to presume that the trial court should have permitted Anderson to testify, any error was harmless under *Watson*. As already discussed, the evidence had limited probative value because of its remoteness. Moreover, as already discussed, the jury heard evidence that Thompson could be violent and that he carried a firearm. Accordingly, it is not reasonably probable that there would have been a different result had the jury heard Anderson's testimony.

**D. *Excluding Evidence of Mercer's 2002 Statement to the Police***

Defendant argues that Mercer's statement to the police satisfied the requirements of Evidence Code section 1370 and that the trial court abused its discretion by refusing to admit this police report into evidence.

Evidence Code section 1370 establishes a hearsay exception for out-of-court statements made to law enforcement officials by victims of assault or threats of assault if the declarant is "unavailable" and the statements are "trustworthy." (See, e.g., *People v. Kons* (2003) 108 Cal.App.4th 514, 523-526.) Evidence Code section 1370 provides the following: "(a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met: [¶] (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant. [¶] (2) The declarant is unavailable as a witness pursuant to [Evidence Code section] 240. [¶] (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section. [¶] (4) The

27

statement was made under circumstances that would indicate its trustworthiness. [¶] (5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official. [¶] (b) For purposes of paragraph (4) of subdivision (a), circumstances relevant to the issue of trustworthiness include, but are not limited to, the following: [¶] (1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested. [¶] (2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive. [¶] (3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section. [¶] (c) A statement is admissible pursuant to this section only if the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement."

The People respond that Mercer's statement to the police was inadmissible because defendant failed to give adequate notice as required by Evidence Code section 1370, subdivision (c), and the statement was not trustworthy. We need not consider whether adequate notice was given because we conclude that the trial court did not abuse its discretion when it disallowed this evidence based on the statement not being trustworthy.

In the present case, Mercer made the statement to the police in anticipation of litigation and, since he was the victim, he was clearly interested in the litigation. (Evid. Code, § 1370, subd. (b)(1).) In addition, the surrounding circumstances tended to show that the statement was untrustworthy. Another witness who was not arrested but heard the comments between Mercer and the two women did not hear any reference to a gun during the incident. This witness heard an argument about money but heard nothing to indicate that a robbery was taking place. Indeed, the police appeared shortly after the incident but they did not find any gun in the apartment or on Thompson.

28

Furthermore, when interviewed by Adams, Mercer's rendition of what happened differed significantly from his earlier statement to the police. Mercer reported to Adams that Thompson had a gun and that Thompson robbed him when he passed Thompson, Thompson's mother, and others in front of their house. He did not state that he went into the house and did not assert that Thompson pointed the gun at him. In the police report there was no mention of Thompson's mother.

Finally, the court considered the fact that Mercer did not appear in 2003 for the scheduled trial of Thompson. He again failed to appear in the present case despite being subpoenaed.

Defendant argues that Mercer's statements were trustworthy and relies on *Chambers v. Mississippi* (1973) 410 U.S. 284 and *Chia v. Cambra* (9th Cir. 2004) 360 F.3d 997. These cases hold that the hearsay rule might not apply when the out-of-court declaration has persuasive assurances of trustworthiness. (*Chambers,* at p. 302; *Chia,* at p. 1003.) Defendant points out that the details Mercer gave regarding the exact amount of money that Thompson took from him matched the sums of money the police found on Thompson. When the police searched Thompson's jacket, they found one bundle of bills amounting to $95 and a second bundle of bills amounting to $36, which were precisely the amounts Mercer claimed Thompson took from him. Additionally, the police found Mercer's keys in Thompson's jacket pocket.

Defendant argues that the statements by the two women were untrustworthy and the witness who did not hear anything about a gun was in a different room and not present during the assault. Defendant also dismisses the significance of Mercer's failure to appear to testify at the preliminary hearing in 2002 and in the present proceeding. He points out that Mercer moved to Arizona and his failure to appear has no bearing on his trustworthiness.

We disagree with defendant that the trial court abused its discretion in finding that Mercer's statements were untrustworthy. Mercer claimed that Thompson pointed a gun at him but no gun was ever recovered and there was no

29

corroborative evidence to support this statement. The fact that Mercer's rendition of events to Adams differed significantly from what he told the police was also significant. We also disagree with defendant's argument that Mercer's failure to appear at Thompson's preliminary hearing or the current murder trial of defendant was insignificant. It indicated that Mercer had some reason for not wanting to testify and repeat the statements that he had made to the police. The record contains no evidence suggesting that Mercer failed to appear simply because he now lives in Arizona.

Accordingly, we conclude that the trial court did not abuse its discretion in refusing to admit the police report regarding Thompson's robbery of Mercer. Furthermore, any error was harmless under *Watson*. As already noted, the jury heard evidence that Thompson had a gun. The picture of Thompson with a gun as well as the evidence of his prior conviction of being a felon in possession of a firearm were far more persuasive than Mercer's uncorroborated statement that Thompson had a gun when he robbed him. Furthermore, as already noted, the jury heard other evidence that Thompson had been violent in the past. Accordingly, even if Mercer's statement to the police had been admitted, it is not reasonably probable that there would have been a different verdict.

**II.** *Admitting Shaffer's Opinion on the Expected Location of the Casings*

**A.** *Background*

Defendant claims that the trial court erred when it admitted Detective Schaffer's testimony regarding the significance of the location of the expended cartridges. He claims that Shaffer did not have the required expertise to give an opinion on the location where he would expect the expended casings to be found if the shooter were in a particular position.

Before the trial began, the defense filed an in limine motion to exclude improper lay opinion on expert matters. Defendant argued that a police officer could not express an opinion on whether the expended casings found on the ground were consistent with the testimony of Pickett because this would be a lay

opinion on an expert matter beyond common experience. The court granted the motion "unless the People think they can adequately establish a foundation for expert opinion by the police officer."

Shaffer had explained that he had extensive training in and experience with firearms and ammunition. Shaffer was qualified as an expert and testified without objection to his opinion that the shell casings would have landed near the staircase if the gunman had fired the gun with his back against the railing. He stated that a right-side ejection port ejects shell casings "to the right and slightly upwards" and the ejected shell casing "make[s] a loop off to the right" and "will generally land within a few to several feet of the shooter's right, and sometimes slightly behind." The casings were actually found in the rocky area between the sidewalk and the parking lot.

During rebuttal, the People asked Shaffer where he would expect the casings to be found based on defendant's rendition of what happened. Defense counsel established that Shaffer was not "a forensic scientist in firearms or ballistics analysis" or "in the area of crime scene reconstruction." Defense counsel moved to strike Shaffer's testimony based on, among other things, his not being an expert in the area of ballistic science.

The trial court denied defendant's motion to strike Shaffer's testimony and explained Shaffer was testifying about the ejection of shell cases, which was not a ballistics issue. The court noted that the testimony showed that Shaffer had training and experience, which included the discharge of firearms 10,000 plus times. The court found that this experience showed that "he was competent to" testify and defendant could cross-examine him. The court elaborated: Shaffer was asked to "consider the gun, the placement of the gun, the position of the gun as the defendant demonstrated it to the jury, when the shots were fired" and then asked to answer where he would expect the ejection of the shell casings to be located.

31

**B.** *Relevant Law and Standard of Review*

Evidence Code section 720 provides: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert. [¶] (b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony."

" 'The competency of an expert is relative to the topic and fields of knowledge about which the person is asked to make a statement.' " (*People v. Kelly* (1976) 17 Cal.3d 24, 39.) A trial court's decision on this ground is subject to the abuse of discretion standard. (*People v. Ashmus* (1991) 54 Cal.3d 932, 971, overruled on other grounds in *People v. Yeoman*, *supra*, 31 Cal.4th at pp. 117-118.)

**C.** *Applying the Law to the Facts*

Defendant argues that Shaffer had no expertise in firearms or ballistics and there was no testimony that Shaffer had conducted any tests on firearms of the type used by defendant or that he was qualified to conduct such testing. Defendant maintains that Shaffer's opinion was based solely on his personal experience of firing different weapons. Defendant points out that the court originally ruled that such testimony could not be admitted without a proper foundation. He claims that the court then abused its discretion when it permitted such testimony in rebuttal.

Shaffer testified that he was familiar with the type of weapon used to kill Thompson. He also stated that he was familiar with the casings that were expended and with the ejection port of this weapon. He testified that he had fired at least 10,000 rounds from guns with ejection ports on the right side. Thus, the People provided the proper foundation to show that Shaffer was familiar with the

32

weapon used and where the expended casings would land. Shaffer's testimony did not require any ballistics training; he did not testify as to where the casings were actually found. Accordingly, we conclude that the trial court did not abuse its discretion in permitting Shaffer to testify about the expected location of expended cartridges if the shooting occurred as defendant said it did.

### III. *The Supplemental Brief*

### A. *Denying Defendant's Motion for a New Trial Based on Juror Misconduct*

Defendant claims that the judgment must be reversed based on the misconduct of Juror Nos. 4 and 8. Defendant raised this issue in the trial court in his motion for a new trial, and the court rejected this contention.

Juror misconduct is one of the specified grounds for granting a new trial. (Code Civ. Proc., § 657, subd. 2.) The trial court must undertake a three-step process to evaluate a motion for new trial based on juror misconduct. The trial court must first "determine whether the affidavits supporting the motion are admissible. (Evid. Code, § 1150.)" (*People v. Dorsey* (1995) 34 Cal.App.4th 694, 703.) We review this decision under the abuse of discretion standard. (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345.)

If the affidavits supporting the motion are admissible, the trial court then determines whether the facts establish misconduct. (*Barboni v. Tuomi, supra,* 210 Cal.App.4th at p. 345.) " 'The moving party bears the burden of establishing juror misconduct. [Citations.]' " (*Ibid.*) When reviewing the trial court's ruling on whether misconduct occurred, " ' " [w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.]" ' [Citations.]" (*Ibid.*)

Finally, if the trial court finds misconduct, it must then determine whether the misconduct was prejudicial. (*Barboni v. Tuomi, supra,* 210 Cal.App.4th at p. 345.) "On appeal, this court reviews the entire record, including the evidence, and makes an independent determination as to whether the misconduct was prejudicial." (*Ibid.*)

In support of his motion for a new trial, defendant submitted the declaration of Juror No. 8, which states in pertinent part: "I would have voted for an acquittal based on self-defense but what changed my mind was the pattern of the casings. The evidence supported self-defense except for the pattern of the casings for the final shots. Even though neither side brought it up in their arguments, the pattern of the casings for the last couple or few shots made the incident look more like an offensive move rather than a defensive move."

Defendant also provided the declaration of Juror No. 4, which states in pertinent part: "To conclude that [defendant] did not prove self-defense, the jury considered the culmination of circumstantial evidence starting from when Thompson brandished the firearm until [defendant] was brought in for questioning several days later. [¶] . . . I believe that [defendant drew his weapon and fired because he believed his life was in danger and I believe it was reasonable for him to believe this. [¶] . . . The events and actions up to and including the event where [defendant] fled the scene did not raise the level of doubt enough for me to conclude that [defendant] believed his actions were unnecessary to protect his own life or were excessive. [¶] . . . The culmination of actions and events from the time during the shooting and the time after [defendant] fled the scene raised the level of doubt, for me, high enough that I believed that [defendant] probably knew that the amount of force used in the resulting shooting was excessive. There was a lot of circumstantial evidence that seemed to hurt his credibility and call into question some of [defendant's] actions that may have otherwise seemed incidental or even innocent. Therefore, [defendant] did not prove self-defense."

The People argue that the affidavits of Juror No. 8 and Juror No. 4 were inadmissible under Evidence Code section 1150, subdivision (a). Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.

34

No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

Courts have consistently interpreted Evidence Code section 1150 as distinguishing " ' "between the proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . ." ' [Citations.] ' "The only improper influences that may be proved under [the statute] to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration." ' " (*People v. Collins* (2010) 49 Cal.4th 175, 249.)

The two jurors' declarations relied upon by defendant are descriptions of how they decided the case, i.e., their subjective reasoning processes. " '[W]hen a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 389.) Here, Juror No. 8's declaration that he did not vote for acquittal because of the pattern of the casings is clearly the subjective reasoning process of this juror. His reason for rejecting the self-defense theory was not open to sight, hearing, or other sense so as to be corroborated. This declaration was inadmissible. (See, e.g., *People v. Danks* (2004) 32 Cal.4th 269, 300-302.) Similarly, the declaration of Juror No. 4 that explains what evidence persuaded him to conclude that defendant did not act in self-defense is a subjective reasoning process. A juror's statement about what he or she finds persuasive is not admissible. (See *People v. Collins, supra,* 49 Cal.4th at p. 250; *People v. Steele* (2002) 27 Cal.4th 1230, 1261.)

Defendant argues that Juror No. 8 committed misconduct because he referred to facts that were not received into evidence. This juror did not examine evidence outside the trial. Rather, he relied on his own level of understanding and

35

attached a particular significance to the evidence on the casings. This declaration was simply a reflection of Juror No. 8's mental process.

Defendant contends that Juror No. 4 misapplied the law. He maintains that this juror's declaration showed that he "believed" that defendant drew and fired his gun in self-defense. Since the juror voted to convict defendant for murder, the juror must have, according to defendant, misapplied the law and committed misconduct. The juror's declaration indicates that he misstated the law when he stated that the defendant has not proved self-defense, but it did not show that he misapplied the law.[3] Instead, the declaration simply revealed the juror's thinking process. The juror initially believed that defendant was acting in self-defense when he drew his weapon and fired, but he began to doubt defendant's credibility and claim of self-defense when he considered the evidence that defendant fled from the scene and other circumstantial evidence.

We therefore conclude that the trial court did not abuse its discretion in finding that the declarations of Juror Nos. 8 and 4 were inadmissible under Evidence Code section 1150. Thus, the court did not err in denying defendant's motion for a new trial based on juror misconduct.

**B. *Refusing to Modify the Judgment***

Defendant argues that, alternatively, this court under Penal Code section 1260 should modify his murder conviction to manslaughter. Defendant claims his murder conviction rested solely upon the testimony of Pickett and claims that Pickett's testimony was not credible.

Penal Code section 1260 provides: "The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or

---

[3] In a subsequent declaration, this juror stated that he did not misapply the law and did not shift the burden of proof to defendant. He stated that he "made the prosecution prove the case to me beyond a reasonable doubt." He declared, "What I meant to say in my prior affidavit was that I listened to all of the evidence, and that based on the evidence, I did not believe that the killing was done in the lawful self-defense."

attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances."

" 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

The jury convicted defendant of murder (Pen. Code, § 187, subd. (a)). Defendant does not specify which element of the murder conviction was not supported by substantial evidence. Murder is defined as the unlawful killing of a human being with malice aforethought. (Pen. Code, §§ 187, subd. (a), 192.) The honest belief of imminent peril negates malice in a case of self-defense, and the reasonableness of the belief goes to the justification for the killing. (*People v. Flannel* (1979) 25 Cal.3d 668, 679, superseded by statute on another issue.) "An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter." (*Id.* at p. 674, italics omitted.)

Defendant's argument appears to be that Pickett's testimony was the sole evidence contradicting his testimony that he had an actual belief in the need for self-defense. He thus criticizes Pickett's testimony and argues that Pickett stated that he saw the crime but admitted that his blinds were drawn and that he was distracted because he was viewing pornographic material. Defendant argues that these physical and environmental restrictions made his testimony automatically unbelievable. He also attacks Pickett's credibility.

37

Defendant's arguments go to the weight of the evidence. The jury heard Pickett's testimony that the blinds limited his view and Pickett was cross-examined about what he could or could not see. Nothing in the record established that Pickett's testimony about what he saw was patently false. The jury also heard evidence related to Pickett's credibility and it was for the jury to decide how much weight to give his testimony. Furthermore, the jury was not required to believe defendant's testimony, as the jurors could conclude that defendant had a clear reason to lie. Moreover, the prosecution pointed out the serious inconsistencies in defendant's testimony as well as the manner in which it contradicted other witnesses' testimony.

Additionally, Pickett's testimony was not the sole evidence contradicting defendant's rendition of what happened. Circumstantial evidence supported the jury's rejection of self-defense. Defendant fled after he shot the victim and offered no assistance to the wounded victim. Defendant told Permenter immediately after the shooting: "Bitch, you'd better not say my name." Shaffer testified that all seven of the casings were from the same gun, indicating that the victim had not shot a gun. The victim had five gunshot wounds, and thus defendant continued to shoot after the victim had been injured. The five shots were in vital parts of Thompson's body: Thompson was hit in the back, the stomach, twice in the chest, and in the back of his arm. There was testimony that the downward path of the bullets indicated that the victim was shot while falling on the ground and with defendant directly over him. The firing of seven shots, five that hit the victim, as well as the other circumstantial evidence supported a finding of implied malice.

Defendant also seems to claim that the fact that the jury rejected a first-degree murder charge shows that the evidence did not support the murder verdict. The jury found that the evidence did not show premeditation, but the jurors rejected defendant's testimony that he had an actual belief in the need for self-defense and, as already discussed, circumstantial evidence supported this finding.

38

**C.** *Admitting Defendant's Prior Statements*

After the police arrested defendant in the apartment in Sacramento on July 25, 2007, Detective Cohen provided defendant with his *Miranda* rights and defendant waived them. After waiving his rights, defendant told Cohen that he knew why he was there and that the media had "twisted" the story and no one had his "side" of the story. After Cohen responded that the police did not know exactly what had happened but only knew that some shots had been fired, that one person had fled, and that one person was on the ground, defendant added that he was "pretty sure she told you everything."

Cohen told defendant that "obviously" he had "a part" in the incident and that was why it was important for the police to talk to him. Defendant answered, "I know." Defendant indicated that he would talk to Cohen but he did not "want to do it here" in Sacramento. Defendant said he would talk to Cohen when he was transferred to Fairfield.

Cohen told defendant that he was concerned that there was a gun somewhere and he did not want someone to get hurt. Defendant insisted that the gun was not in Sacramento. Cohen asked the location of the gun used by defendant on July 15th. Cohen then stated that he would see if he could get defendant moved to Fairfield that night.

Cohen arranged to have defendant transported to Fairfield, and spoke to defendant again after the transfer. Defendant stated that the news in the paper and on the Internet revealed that he was wanted for "killing somebody and hanging out in the parking lot waiting for somebody to come out . . . ." He complained that "they already got me guilty." He asked how he could get a "fair fight" since they "painted" him "like a monster." Defendant noted that he did not have an attorney and did not know how much to say. He did not know what information would hurt him and what would help him. He asked if he could have somebody there with him. When Cohen asked whether he was asking for a lawyer, defendant answered, "Yeah." Cohen explained that he did not have a lawyer to assign to him

39

at that point and that would be done after he was booked and had his first court appearance.

Defendant stated that he wanted to ask Cohen simple questions off the record and Cohen could give an affirmative or negative response. Defendant asked whether his arrest warrant was for murder, and Cohen told him that it was. Defendant asked whether it could be "just manslaughter." Defendant added: "If I say, 'woo' . . . and we go through all the things and you talk to whoever you need to talk to whoever I need to talk to and you take to who is the [district attorney] and maybe we can work something with that. That's what I mean you know like, you feel me? If you know what I'm saying, if my story get out, the whole truth you know what I'm saying and then investigate with what you heard or what not and you pretty much the [district attorney] can just see and maybe it could be that." Cohen responded, "Okay."

At trial, defendant testified that he told Cohen he wanted an attorney and that Cohen "was trying to get in contact with an attorney that" he had before. Defendant added that his attorney "actually called . . . one of the detectives back . . . and they gave me the cell phone and I talked with him." Defendant reported that he did not tell Cohen his story because he had talked to his attorney and was advised not to answer any questions.

When the defense requested to suppress the statements he made to the detective after requesting an attorney, the trial court ruled that defendant's request for an attorney was ambiguous. It also ruled that defendant's statements following his request for an attorney were not in response to any questions asked by the detective.

Even if we were to presume that defendant's request for an attorney was clear and that the court erred in permitting the jury to hear defendant's statements following his request for an attorney, we conclude that any such error was clearly harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24.) We will not reverse when the court commits federal constitutional error when

40

admitting the defendant's statements if we conclude that the error was harmless beyond a reasonable doubt. (See, e.g., *People v. Talley* (1967) 65 Cal.2d 830, 840.)

The statements at issue involved defendant's asking whether his arrest was for murder and whether it could simply be manslaughter. He also indicated that he wanted to find out if something could be worked out with the district attorney.

The foregoing statements were harmless beyond a reasonable doubt. Defendant in his testimony admitted that he shot the victim. The only other relevant information contained in these statements was that he was interested in a plea bargain and his failure to claim that his actions were in self-defense. The fact that defendant was interested in a plea bargain was not prejudicial because defendant had previously told the detective, after he had waived his *Miranda* rights and before he asked for an attorney, that he believed the news coverage made it impossible for him to receive a fair trial. Similarly, defendant never mentioned self-defense to the detective prior to his asking for an attorney and after he waived his *Miranda* rights. Moreover, the record showed that defendant never mentioned self-defense to Permenter immediately after he shot the victim.

Defendant also claims that the statements should have been excluded because the prosecution improperly commented on his silence in closing argument when stressing that he never mentioned self-defense. Defendant's argument lacks merit. The prosecution was not commending on defendant's silence. Indeed, defendant did not remain silent. Rather, the prosecution noted that in all of defendant's comments to the detective and others he never claimed that he acted in self-defense.

We conclude that defendant's statements after he requested an attorney did not provide the jury with any new information and the record would not have been significantly different had the trial court ruled that these statements were inadmissible. Accordingly, we conclude any alleged error was harmless under *Chapman, supra,* 386 U.S. at page 24.

41

**D.** *No Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct when she told the jury in her rebuttal argument, over the defense's objection, that Thompson was shot in the back and when she attacked the credibility of a defense expert, Psychologist Robert Shomer.

Behavior by a prosecutor violates the federal Constitution when it is egregious enough to render the trial fundamentally unfair and the conviction a violation of due process. A prosecutor's conduct may violate state law where he or she uses deceptive or reprehensible methods to persuade either the court or the jury. (*People v. Hill* (1998) 17 Cal.4th 800, 819, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) It is misconduct to misstate or mischaracterize the evidence or to refer during argument to facts that are not in evidence. (*Id.* at pp. 823, 827-828.) At the same time, prosecutors have wide latitude in their arguments to comment on the evidence and draw reasonable inferences from it. "Counsel may argue facts not in evidence that are common knowledge or drawn from common experiences." (*People v. Young* (2005) 34 Cal.4th 1149, 1197.) We review the "trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) As a general rule, to preserve a claim of prosecutorial misconduct, the defense must make a timely objection and request and admonition to cure any harm. (*People v. Frye* (1998) 18 Cal.4th 894, 969, overruled on another issue in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Defendant points to the prosecutor's argument that the victim had been shot in the back as misstating the evidence. Dr. Josselson, however, testified that Thompson suffered a gunshot wound on the left elbow and that it went in the back of his elbow. He also discussed a photograph, which showed the shot that went across the right side of the back and did not enter the chest.

Defendant asserts that being shot in the back of the elbow is not the same as being shot in the back. The testimony of Dr. Josselson was that the bullet went

42

across the right side of the back and entered at the victim's back elbow. The prosecutor did not misstate the testimony but commented on a reasonable inference from Dr. Josselson's testimony.

Defendant also objects to the prosecutor's comments regarding the testimony of defendant's expert, Psychologist Shomer. Shomer testified about why an eyewitness, in this case Pickett, might not give accurate testimony. In closing argument, the prosecutor stated that Shomer was paid $3,500 to come and tell the jury that Pickett did not see what he saw. The prosecutor added: "So they get this guy, they pay him for his services. Talk about prostituting." Defense counsel objected and the court sustained the objection. Defense counsel did not request an admonition.

Defendant acknowledges that the trial court sustained his objection to the prosecutor's comment about "prostituting" but maintains that the damage was already done. Defendant's failure to request an admonition forfeits the right to claim prosecutorial misconduct on appeal unless the comment could not be cured by an admonition. (See *People v. Montiel* (1993) 5 Cal.4th 877, 914.) Here, an admonition to disregard the comment about Shomer's prostituting himself would clearly have cured the error. Moreover, even if the issue were preserved for appeal, the misconduct was harmless under *Chapman, supra,* 386 U.S. at page 24. The comment in question was brief and not repeated in the prosecutor's closing argument. (See *People v. Abilez* (2007) 41 Cal.4th 472.)

**E.  *No Cumulative Error***

Defendant requests this court to "consider all of the merits raised in the motion for [a] new trial, and [in] all related hearings and filings" and then reverse based on cumulative error. He maintains that this was a close case and that substantial and various errors require reversal.

Defendant's argument is essentially that the alleged errors resulted in cumulative prejudice. As discussed, we have determined that there was no error or, even when we have presumed error, such error was harmless. We conclude

that there was no cumulative deficiency arising from a combination of particular errors that requires reversal.  (See *People v. Salcido* (2008) 44 Cal.4th 93, 156.)

## DISPOSITION

The judgment is affirmed.

_____
Lambden, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.